# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**JUDICIAL WATCH, INC.,**

    **Plaintiff,**

       **v.**

**U.S. DEPARTMENT OF STATE and
FEDERAL BUREAU OF
INVESTIGATION,**

    **Defendants.**

</td><td>

Civil Action No. 12-893 (JDB)

</td></tr>
</table>

## MEMORANDUM OPINION

This case arises from identical Freedom of Information Act ("FOIA") requests that Judicial Watch submitted to the Department of State and the Federal Bureau of Investigation, seeking any records concerning Anwar Aulaqi,[1] an American-born Muslim cleric who was killed by a drone strike in Yemen in September 2011. After several years of document productions and ongoing negotiations, the parties have narrowed their remaining disputes to two issues: whether the FBI properly withheld in full seven surveillance videos under FOIA Exemption 7(E), and whether the State Department conducted an adequate search for records under FOIA. Now before the Court are the parties' cross-motions for summary judgment. The Court will grant summary judgment to the FBI and deny Judicial Watch's cross-motion for summary judgment on the question whether the FBI properly withheld the surveillance videos. The Court is not able to grant either the State Department's or Judicial Watch's respective motions for summary judgment regarding whether the State Department conducted an adequate search, and therefore will deny both motions.

---

[1] Alternative spellings include al-Aulaqi, al-Awlaki, and al-Awlqi.

However, the State Department may file a renewed motion that supplements the record and addresses the concerns raised by the Court below.

# I.   <u>BACKGROUND</u>

Anwar Aulaqi was a U.S. citizen born in New Mexico in 1971. Pl.'s Stmt. of Undisputed Facts [ECF No. 54] ¶ 6. Aulaqi grew up in Yemen and later studied at universities in the United States. <u>See</u> Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Comm'n Report at 221 (2004), <u>available at</u> https://9-11commission.gov/ ("9/11 Comm'n Report").[2] The FBI investigated Aulaqi in 1999 and 2000 after learning that he may have been contacted by an associate of Osama Bin Laden. <u>See</u> Pl.'s Stmt. of Undisputed Facts ¶ 8 (citing 9/11 Comm'n Report at 517). The FBI also investigated Aulaqi's contacts with two of the 9/11 hijackers at mosques in San Diego and Virginia. <u>Id.</u> (citing 9/11 Commission Report at 221, 517). After the 9/11 terrorist attacks, the FBI conducted video and photographic surveillance of Aulaqi between at least September 27, 2001 and March 29, 2002, at various locations in and around Washington, D.C. <u>Id.</u> ¶ 19. Thereafter, Aulaqi left the United States and returned to Yemen. He was killed by a drone strike in Yemen on September 30, 2011. <u>Id.</u> ¶ 6.

The same day that Aulaqi was killed, Judicial Watch submitted identical FOIA requests to the State Department and the FBI requesting:

> [A]ny and all records concerning, regarding or related to a deceased individual named Anwar al-Awlaki, a/k/a Anwar Aulaqi. This individual was born on April 22, 1971 in Las Cruces, New Mexico and died on or about September 30, 2011. As proof of death, [Judicial Watch has] enclosed a copy of the New York Times obituary of the individual.

Compl. [ECF No. 1] ¶¶ 6, 9; <u>see also</u> Answer [ECF No. 10] ¶¶ 6, 9.

---

[2] The Court grants Judicial Watch's request to take judicial notice of facts contained in the 9/11 Commission Report. <u>See</u> Pl.'s Stmt. of Undisputed Facts ¶ 5 n.2; <u>see also</u> <u>In re Sept. 11 Litig.</u>, 751 F.3d 86, 90 (2d Cir. 2014) (taking judicial notice of 9/11 Commission Report).

By letter dated October 6, 2011, the FBI acknowledged receipt of Judicial Watch's FOIA request, assigned it a request number, and advised that the FBI was searching the indices to the Central Records System for responsive information. Compl. ¶ 10; Answer ¶ 10; Hardy 1st Decl. [ECF No. 51–4] ¶ 6. By letter dated October 20, 2011, the State Department acknowledged receipt of the FOIA request and assigned it a case control number. The State Department indicated that it would notify Judicial Watch "as soon as responsive material has been retrieved and reviewed." Compl. ¶ 7; see also Answer ¶ 7.

Neither defendant agency provided a substantive response before Judicial Watch filed this lawsuit on June 4, 2012. See Answer ¶ 12. On August 30, 2012, the Court issued a scheduling order under which the State Department and FBI were to provide monthly productions of any non-exempt responsive records. See Aug. 30, 2012 Scheduling Order [ECF No. 15] at 1. Thereafter, the defendant agencies conducted their respective searches and produced records responsive to the FOIA request. The FBI ultimately released more than 4,400 pages of non-exempt, responsive records, in full or part, between December 21, 2012 and September 30, 2014. Hardy 1st Decl. ¶ 8. The State Department released 448 non-exempt, responsive records, in full or part, from nine departmental records systems between September 28, 2012 and June 19, 2015. Fischer Decl. [ECF No. 51–5] ¶¶ 7–32.

On December 18, 2014, the State Department and the FBI informed the Court that they had "finished the primary processing of responsive materials," with the exception of certain records referred to non-defendant agencies for processing. See Dec. 18, 2014 Joint Status Report [ECF No. 27] at 1. On June 19, 2015, the State Department and the FBI provided Judicial Watch with draft Vaughn indices addressing all documents withheld pursuant to an applicable FOIA exemption. See July 24, 2015 Joint Status Report [ECF No. 28] at 1–2. The State Department

also conducted supplemental searches of additional records, including: retired electronic files used by employees in the Office of the Secretary during former Secretary Clinton's tenure; unclassified and classified state.gov emails of six individuals who served under Secretary Clinton; tens of thousands of pages of documents provided to the State Department by four individuals who served under Secretary Clinton; and approximately 30,000 emails (comprising approximately 55,000 pages) provided to the State Department by Secretary Clinton. See Feb. 12, 2016 Joint Status Report [ECF No. 40] at 2–3; Fischer Decl. ¶¶ 70–78. The State Department released more than 1,700 records, in full or part, from these supplemental searches. Fischer Decl. ¶¶ 33–39.

On July 8, 2016, the State Department sent a letter to then-FBI Director James Comey requesting that the FBI provide any additional work-related emails of Secretary Clinton. Fischer Decl. ¶ 79. The FBI transferred this information to the State Department on July 21 and August 5, 2016. Id. A search of these emails yielded two responsive records. Id. ¶ 81. The parties have continued to cooperatively engage in ongoing negotiations in an effort to narrow the issues in dispute. See Jan. 12, 2017 Joint Status Report [ECF No. 50] ¶ 2. As a result, the parties proposed a briefing schedule and identified five remaining disputed issues. See id. The parties then filed cross-motions for summary judgment, which further narrowed the remaining issues to two: (1) whether the FBI can withhold in full seven surveillance videos under FOIA Exemption 7(E); and (2) whether the State Department conducted an adequate search for responsive records. The Court addresses these issues below.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Evidence is construed in the light most favorable to the non-moving party; however,

factual assertions made in the moving party's declarations may be accepted as true unless the opposing party submits affidavits, declarations, or documentary evidence to the contrary. See, e.g., Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006); Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Georgacarakos v. FBI, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (internal quotation marks omitted) (quoting Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). FOIA provides a "'statutory right of public access to documents and records' held by federal agencies." Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting Pratt v. Webster, 673 F.2d 408, 413 (D.C. Cir. 1982)). As the Supreme Court has explained, FOIA is "a means for citizens to know what their Government is up to." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 171 (2004) (internal quotation marks omitted). Thus, FOIA requires federal agencies to make their records available to the public upon request, unless the requested information falls under one of nine statutory exemptions to disclosure. See 5 U.S.C. § 552(b).

District courts review de novo an agency's decision to withhold requested documents under a statutory exemption, and the agency "bears the burden of proving the applicability of claimed exemptions." Am. Civ. Liberties Union (ACLU) v. U.S. Dep't of Defense, 628 F.3d 612, 619 (D.C. Cir. 2011); 5 U.S.C. § 552(a)(4)(B). To satisfy its burden, the agency may submit supporting declarations of responsible agency officials. See ACLU, 628 F.3d at 619. "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the withheld information logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment

is warranted on the basis of the affidavit alone." Id. Agency declarations are afforded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" ACLU, 628 F.3d at 619 (some internal quotation marks omitted) (quoting Larson v. U.S. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)). In cases like this one, which implicate national security concerns, courts must "accord substantial weight to agency affidavits." Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal quotation marks omitted); Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926–27 (D.C. Cir. 2003) ("[B]oth the Supreme Court and this Court have expressly recognized the propriety of deference to the executive in the context of FOIA claims which implicate national security.").

## III.    DISCUSSION

### A.  FBI Surveillance Videos

The FBI withheld seven surveillance videos in full under FOIA Exemption 7(E).[3] Judicial Watch argues that the FBI has not sustained its burden of showing that the videos may be withheld in full and, at a minimum, the FBI should be required to release segregable portions of the videos. The Court disagrees and finds the FBI properly withheld the videos and thus is entitled to summary judgment.

FOIA exemption 7(E) exempts from disclosure "records or information compiled for law enforcement purposes," the production of which "would disclose techniques and procedures for

---

[3] The seven videos are identified by the following FBI serial numbers: 1A-4 (Sept. 27, 2001); 1A-14 (Oct. 1, 2001); 1A-20 (Oct. 3, 2001); 1A-310 (Mar. 8, 2002); 1A-352 (Mar. 28, 2002); 1A-354 (Mar. 28, 2002); and 1A-357 (Mar. 27, 2002). See Hardy 2nd Decl. [ECF No. 56–1] ¶ 6 n.3.

law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The D.C. Circuit has recognized that "Exemption 7(E) sets a relatively low bar for the agency to justify withholding." Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011). The agency need only demonstrate "logically how the release of the requested information might create a risk of circumvention of the law." Id.; see also Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (agency need only show "reasonably expected risk" of circumvention).

Judicial Watch does not dispute that the surveillance videos were compiled for law enforcement purposes. See Pl.'s Opp'n and Cross-Mot. [ECF Nos. 53 & 54] at 8. Hence, the FBI need only demonstrate how release of the videos might logically create a risk of circumvention of the law. To that end, David Hardy, the Chief of the FBI's Record/Information Dissemination Section, explained that although "[p]hysical surveillance is a known law enforcement technique" there are "many non-public details about its use . . . that necessarily must remain non-public in order to retain the utility of this valuable technique." Hardy 1st Decl. ¶ 81. These seven videos depict "tradecraft" such as the use of "vantage points" and "concealment techniques," id. ¶ 82, that "are [used] today and will continue to be used by the FBI in its surveillance efforts," id. ¶ 81; see also Hardy 2nd Decl. ¶ 7. Because foreign intelligence officers and other "adversaries" use "publicly-released information . . . to determine the sources and methods of FBI investigations to include surveillance techniques," the release of these videos will provide them with "actionable information that can be used to detect and avoid surveillance in the future." Hardy 1st Decl. ¶ 82 (releasing videos will lead to "countermeasures and circumvention"). These statements logically explain how releasing the content of these videos could help criminals circumvent the law, and

that "suffices here to justify invocation of Exemption 7(E)." Blackwell, 646 F.3d at 42; see also, e.g., Showing Animals Respect and Kindness v. U.S. Dep't of Interior, 730 F. Supp. 2d 180, 199–200 (D.D.C. 2010) (videos and photographs were properly withheld in full under Exemption 7(E) because "they reveal specific details of surveillance techniques . . . which could compromise [the Fish and Wildlife Service's] ability to conduct future investigations at various National Wildlife Refuges")[4]; Durrani v. U.S. Dep't of Justice, 607 F. Supp. 2d 77, 91 (D.D.C. 2009) (government properly applied Exemption 7(E) to withhold "surveillance techniques" that "could impede current and future investigations"); Perrone v. FBI, 908 F. Supp. 24, 28 (D.D.C. 1995) (FBI form containing data on effectiveness of investigative techniques properly withheld under Exemption 7(E) because "disclosure . . . would help . . . potential criminals predict future investigative actions and consequently employ countermeasures").

Judicial Watch argues that even if the videos cannot be released in full, the FBI should release segregable portions by isolating video clips or producing still photos at intervals throughout the videos. See Pl.'s Opp'n and Cross-Mot. at 11. Under FOIA, an agency is obligated to release "[a]ny reasonably segregable portion of a record." 5 U.S.C. § 552(b). The FBI responds with two

---

[4] Judicial Watch attempts to undermine the Hardy declarations based on an improperly narrow reading of Showing Animals, a case cited by the FBI in its motion. See Pl.'s Reply [ECF No. 57] at 5–6 (arguing the Hardy declarations are inadequate because they do not attest that the FBI "continues to use the same surveillance equipment that was used to surveil Awlaki almost 15 years ago"); Defs.' Mot. Summ. J. [ECF No. 51] at 36. But in Showing Animals, the court held that surveillance videos could be withheld in full under Exemption 7(E) because the government attested that "they reveal[ed] specific details of surveillance techniques." 730 F. Supp. 2d at 200. The holding is not limited to the specific details revealed in that case, i.e., "the equipment used and location and timing of its use," id., and applies with equal force to the surveillance details at issue here.

Moreover, the two cases cited by Judicial Watch are distinguishable. See Pl.'s Opp'n and Cross-Mot. at 9. In Elec. Privacy Info. Ctr. v. FBI, 235 F. Supp. 3d 207, 216 (D.D.C. 2017), the court denied summary judgment on the sole basis that the government had not demonstrated that the records at issue were compiled for law enforcement purposes, a point that Judicial Watch has conceded here. And in Schwartz v. DEA, No. 13CV5004CBARML, 2016 WL 154089 (E.D.N.Y. Jan. 12, 2016), the court determined that Exemption 7(E) did not shield a video from disclosure based on plaintiff's provision of more than a "dozen similar videos, showing [similar] techniques and procedures," which undermined the government's claim that the withheld video revealed non-public details. Id. at *13. Judicial Watch has provided no such evidence here.

8

arguments. The FBI first argues that releasing still photos would require the FBI to create a new federal record, which it is not obligated to do under FOIA. See Defs.' Reply [ECF No. 55] at 5; Hardy 1st Decl. ¶ 83. Recognizing that "[i]t is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request," Yeager v. DEA, 678 F.2d 315, 321 (D.C. Cir. 1982), the Court is unconvinced that isolating portions of the videos (either as still photos or video clips) constitutes the creation of a new record. The FBI has cited no case in which a Court has adopted its position. Hence, the Court rejects this argument.

The FBI next relies on the Hardy declarations, which state that "there is no information that can be segregated without revealing exempt information [such as] how the surveillance was conducted, from what vantage, behind what concealments, etc." Hardy 2nd Decl. ¶ 8; see also Hardy 1st Decl. ¶ 83. This is so, Hardy maintains, because "photos can be pieced together to reveal the same tradecraft that the FBI is protecting by withholding the videos themselves." Hardy 1st Decl. ¶ 83; see also Hardy 2nd Decl. ¶ 9 (adversaries could use photos to "create, in essence, a flipbook that would substantially re-create the videos"). These representations demonstrate logically how release of any portions of the videos—either as video clips or still photos—might create a risk of circumvention of the law. See Ctr. for Nat. Sec. Studies, 331 F.3d at 927 (explaining that courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review"); Afshar v. U.S. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (FOIA "bars the courts from prying loose from the government even the smallest bit of information that . . . would disclose intelligence

sources or methods."). The Court is therefore satisfied that the FBI does not need to release any portions of these videos.[5]

Judicial Watch raises several other arguments in opposition to the FBI's motion for summary judgment, none of which are persuasive. The Court will address them only briefly. Judicial Watch argues that the FBI is not entitled to summary judgment because it failed to attest that someone knowledgeable about the FOIA request "identified and reviewed all responsive videos withheld." Pl.'s Opp'n and Cross-Mot. at 9. But David Hardy attested that the videos were identified and reviewed by two employees familiar with Judicial Watch's request from the FBI's Record/Information Dissemination Section. See Hardy 2nd Decl. ¶ 6. In addition, FBI operational personnel familiar with the contents of the videos provided advice on the disposition of the videos. Id. The FBI asserted Exemption 7(E) based on this combined review. Id.

Judicial Watch also argues that the FBI failed to "demonstrate that [disclosure of] each and every video" would reveal law enforcement techniques and procedures that risk circumvention of the law. Pl.'s Opp'n and Cross-Mot. at 9–10. But there is no set format that the FBI must use to justify its withholdings; it need only "give the reviewing court a reasonable basis to evaluate the claim of privilege." Gallant v. NLRB, 26 F.3d 168, 173 (D.C. Cir. 1994). It would make little sense here for the FBI to address each of the videos separately; the Hardy declaration makes clear that all seven videos are being withheld for the very same reasons. See Hardy 1st Decl. ¶ 81.

Judicial Watch further argues that the decision whether to disclose non-public details concerning surveillance techniques must be "determined on a case by case basis as to time,

_____

[5] Judicial Watch contends that at least one of the withheld videos must be released because the FBI already disclosed a still photograph from the same surveillance. See Pl.'s Opp'n and Cross-Mot. at 10 (discussing Oct. 1, 2001 surveillance photograph depicting Aulaqi with his family in Washington, D.C. park). But none of the withheld videos are from that surveillance, and the FBI has confirmed that it has not located a video taken during that surveillance. See Hardy 2nd Decl. ¶ 10.

location, and the subject of surveillance." Pl.'s Opp'n and Cross-Mot. at 10. Judicial Watch points to the surveillance of Aulaqi's Virginia home and argues that because this surveillance took place more than fifteen years ago, the FBI cannot show how disclosure "could possibly erode the effectiveness of surveillance techniques used by the FBI in the present day or currently risk circumventing the law." Id. But the FBI has done exactly that by explaining that it continues to use these same "tried-and-true techniques and procedures even 15 years later" including to conduct physical surveillance of "residential neighborhoods, parks, urban areas, and rural areas." Hardy 2nd Decl. ¶ 7. Disclosure of these "tried-and-true techniques" would allow surveillance targets, including those in residential neighborhoods, to develop and employ countermeasures. Id. Judicial Watch's speculation that the mere passage of time justifies disclosure cannot overcome the sworn declaration from a law enforcement official to the contrary. See Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 32 (D.C. Cir. 1998) ("Because the FBI specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference.").

Finally, the Court declines Judicial Watch's request to review the videos in camera. Whether to conduct in camera review rests squarely within the discretion of the district court. See Spirko v. U.S. Postal Serv., 147 F.3d 992, 996 (D.C. Cir. 1998). The D.C. Circuit has consistently stated, however, that it is to be used as a "last resort." See, e.g., Hayden v. CIA, 608 F.2d 1381, 1387 (D.C. Cir. 1979). This Court has already determined that the FBI has justified its withholding of the videos in full based on two sufficiently detailed declarations. The Court is not well-equipped to second-guess the reasonable assessments offered by these law enforcement professionals. Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The assessment of harm to intelligence sources, methods and operations is entrusted to the [executive intelligence officials], not to the courts."); Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise

in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns").

### B. State Department's Search

Judicial Watch challenges the adequacy of the State Department's search.[6] When a FOIA plaintiff challenges the adequacy of an agency's search, the agency, viewing the facts in the light most favorable to the requester, "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Clemente v. FBI, No. 16–5067, 2017 WL 3443034, at *4 (D.C. Cir. Aug. 11, 2017) (quoting Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990)). "The adequacy of an agency's search is measured by a standard of reasonableness and is dependent upon the circumstances of the case." Perez-Rodriguez v. U.S. Dep't of Justice, 888 F. Supp. 2d 175, 182 (D.D.C. 2012) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). This presumption of good faith "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., 926 F.2d at 1200 (internal quotation marks omitted).

"There is no requirement that an agency search every record system. Oglesby, 920 F.2d at 68; Meeropol v. Meese, 790 F.2d 942, 952–53 (D.C. Cir. 1986) (search not presumed unreasonable simply because it fails to produce all relevant material). Relatedly, a failure to uncover a responsive document does not render the search inadequate; the issue to be resolved "is not whether other responsive documents may exist, but whether the search itself was adequate." Wilson v. U.S. Dep't of Transp., 730 F. Supp. 2d 140, 149 (D.D.C. 2010) (citing Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994)); Perry v. Block, 684 F.2d 121, 128 (D.C. Cir.

---

[6] Judicial Watch does not challenge the adequacy of the FBI's search.

1982) (agency need not demonstrate that all responsive documents were found and that no other relevant documents possibly exist). Summary judgment may be granted if the agency's declarations provide "sufficiently detailed information for a court to determine if the search was adequate." Students Against Genocide v. U.S. Dep't of State, 257 F.3d 828, 838 (D.C. Cir. 2001) (internal quotation marks omitted).

The State Department has submitted declarations from Eric Stein and William Fischer, the Director and Deputy Director, respectively, of the Office of Information Programs and Services ("IPS"). See Stein Decl. [ECF 55–2] ¶ 1; Fischer Decl. ¶ 1. These declarations state that IPS evaluated Judicial Watch's FOIA request and identified nine offices or records systems reasonably likely to contain responsive records: the Central Foreign Policy Records (the principal records system of the State Department), the Bureau of Intelligence and Research ("INR"), the Bureau of Near Eastern Affairs ("NEA"), the U.S. Embassy in Sana'a, Yemen, the Office of Overseas Citizen Services ("OCS"), the Office of Passport Services ("PPT"), the Office of the Legal Adviser, the Bureau of Counterterrorism ("CT"), and the Office of the Executive Secretariat.[7] Fischer Decl. ¶¶ 40–42. IPS relied on the knowledge and expertise of the employees in each of these nine offices to determine the files and locations reasonably likely to house responsive records and the best means of locating such records, including by determining search terms. Id. ¶ 43. As described above, the State Department conducted supplemental searches of tens of thousands of pages of unclassified and classified documents and emails of former Secretary Clinton and members of her staff including Cheryl Mills, Huma Abedin,[8] Jacob Sullivan, Philippe Reines, William Burns,

---

[7] The Executive Secretariat is generally responsible for coordinating search responses for the Office of the Secretary of State, the Office of the Deputy Secretary of State, the Office of Policy Planning, the Offices of the Under Secretary for Political Affairs, and the Office of the Counselor of the State Department. See Fischer Decl. ¶ 68.

[8] The Stein declaration confirmed that the State Department did not "search the classified individual electronic drive belonging to Huma Abedin," Pl.'s Opp'n and Cross-Mot. at 19, because "there was no material stored on [her] classified individual electronic drive at the time the drive was retired[.]" Stein Decl. ¶ 6.

Alice Wells, and Uzra Zeya. Id. ¶ 42. IPS concluded that no other offices or records systems were reasonably likely to contain documents responsive to plaintiff's request. Id. Judicial Watch has raised several challenges to the State Department's search, which the Court analyzes below.[9]

### 1. Search Descriptions

Judicial Watch first argues that "the State Department fails to sufficiently describe most of the searches undertaken in the various offices within the State Department for the Court to be able to determine the reasonableness of the search." Pl.'s Opp'n and Cross-Mot. at 12–13. Specifically, Judicial Watch contends that the descriptions of the searches conducted by six offices are inadequate because they lack certain details. See Pl.'s Opp'n and Cross-Mot. at 14–17 (identifying the NEA, the U.S. Embassy in Sana'a, Yemen, OCS, PPT, Office of the Legal Adviser, and CT). With respect to NEA, the Embassy, and OCS, Judicial Watch argues that the descriptions are inadequate because they do not identify the search terms used or sufficiently describe the types of records searched, and instead merely offer conclusory statements that persons knowledgeable about the FOIA request and the relevant records systems conducted searches using "search terms reasonably likely to return [responsive] records." Id. at 14–15. With respect to the Legal Adviser, Judicial Watch argues that the descriptions fail to identify the search terms and the names of individuals whose email accounts were searched in response to the FOIA request.[10] Id. at 16. Judicial Watch argues that the descriptions of the PPT and CT searches share these shortcomings but are even more deficient because they fail even to attest that the searches were "reasonable to uncover all responsive records" or detail whether officials knowledgeable about the relevant

---

[9] Judicial Watch does not challenge the adequacy of State's search of the Central Foreign Policy Records. See Fischer Decl. ¶¶ 44–46; Pl.'s Opp'n and Cross-Mot. at 12–21.

[10] The State Department subsequently identified the individuals whose email accounts were searched. See Stein Decl. ¶ 9. After reviewing that information, Judicial Watch continues to challenge the temporal scope of the search.

14

records systems carried out the searches. Id. at 16–17; see also Fischer Decl. ¶ 60 ("A search was conducted of PPT records for documents responsive to the subject FOIA request"); Id. ¶ 66 ("A search was conducted of CT records for documents responsive to the subject FOIA request").[11]

The State Department offers several responses. It first states that "it is highly probative that each component identified and released responsive records." Defs.' Reply at 9. But the State Department itself acknowledges that this fact is not determinative. Id. The State Department next states that it "relies on the knowledge and expertise of the employees" of each component "to determine what files and locations are reasonably likely to house responsive records" and the best means of locating such records. Id. (citing Fischer Decl. ¶ 43). But this "general explanation" describes "only basic [agency] policy regarding FOIA responses" and does not supply specific details describing how these six offices conducted reasonable searches. Morley v. CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007). Ultimately, the State Department concedes that "the declarations do not identify the details sought by Plaintiff."[12] Defs.' Reply at 9. Because the State Department has not provided for these six offices a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched," it is not entitled to summary judgment. Iturralde v. Comptroller of the Currency, 315 F.3d 311, 313–314 (D.C. Cir. 2003) (alteration in original). Without these details, the Court is unable to determine whether the searches conducted for these six offices were

---

[11] Judicial Watch also contends that the State Department's declarations did not identify the time limitations used to conduct these six searches. See Pl.'s Opp'n and Cross-Mot. at 14–17. But IPS "did not instruct Department components to limit their searches to documents created after a certain date, or to limit their searches to a particular administration." Stein Decl. ¶ 11. Moreover, IPS sent "search taskers . . . to the Department components [referring them] to the original FOIA request, which did not indicate a temporal limit." Id. The Court finds the descriptions of the searches for these six offices deficient for the reasons described herein, but not because they failed to identify the time period for each search.

[12] Although it may be "reasonable to assume" that "in all likelihood" these components would have employed search terms consisting of variations of Aulaqi's name, see Defs.' Reply at 10, the State Department has the burden of supplying this information in its declarations.

15

adequate. But nor has such a conclusion been precluded. See Lazaridis v. U.S. Dep't of Justice, 766 F. Supp. 2d 134, 150 (D.D.C. 2011) (denying the government's motion for summary judgment because the Court "lack[ed] any evidence of the search terms utilized," but without prejudice as to reconsideration after later supplementation of the record); Judicial Watch, Inc. v. U.S. Dep't of Justice, 185 F. Supp. 2d 54, 65 (D.D.C. 2002) ("[W]hen an agency's affidavits or declarations are deficient regarding the adequacy of its search . . . the courts generally will request that the agency supplement its supporting declarations."). Hence, the Court finds it is inappropriate to grant summary judgment to either party. Instead, the Court will give the State Department a chance to supplement the record by expanding its descriptions of how the searches were conducted for these six offices.

## 2. **Search Terms**

Judicial Watch next argues that the State Department should have conducted certain searches using variants of Aulaqi's last name, rather than variants of his full name, which is "unreasonably narrow, especially for searches of more informal records, such as emails." [13] Pl.'s Opp'n and Cross-Mot. at 13–14, 19. Relatedly, Judicial Watch alleges that the State Department should have used consistent search terms across all systems. Id. at 19. Both of these arguments lack merit.

---

[13] Judicial Watch initially raised this argument for the searches of the following systems: INR; the Executive Secretariat search of STARS, CARS, and STePS; the state.gov emails of Huma Abedin, Cheryl Mills, Jacob Sullivan, William Burns, Alice Wells, and Uzra Zeya; the work-related emails returned by former Secretary Clinton from her clintonemail.com server, and the FBI retrieved records from the clintonemail.com server. See Pl.'s Opp'n and Cross-Mot. at 13. But Judicial Watch withdrew this objection for all emails sent to or by officials under former Secretary Clinton, see Pl.'s Reply at 4 n.1, after State confirmed that these were not Boolean searches and were "designed to retrieve all records containing either [Aulaqi's] first or last name, or one of its variations," Stein Decl. ¶ 5. The State Department also has now clarified that the searches of the Executive Secretariat systems (i.e., STARS, CARS, and STePS) and the FBI retrieved records from the clintonemail.com server included variants of Aulaqi's last name, so Judicial Watch's argument is moot as to those searches. See Stein Decl. ¶¶ 4, 8. Hence, this objection only remains for the INR search.

With regard to the first argument, the State Department attests that it tasked each office with conducting its own searches because they had the requisite knowledge and expertise. See Fischer Decl. ¶ 43. This includes determining "the search terms [that] would yield potentially responsive records" based on their "knowledge[] about the organization of the records systems." Id. For INR, "[a]n Intelligence Operations Specialist, who was knowledgeable about INR's records systems and Plaintiff's request" identified the two INR offices reasonably likely to contain responsive records: the Office of Analysis for Terrorism, Narcotics, and Crime ("TNC"), and the Office of Analysis for Near Eastern Affairs ("NESA"). Id. ¶ 47. A TNC Office Manager searched electronic databases, shared drives, and TNC paper files (which are organized by date and subject matter) using four variants of Aulaqi's full name. Id. ¶ 49. An NESA Foreign Affairs Officer searched all emails, Word documents, spreadsheets, shared drives, and paper files using two variants of Aulaqi's full name. Id. ¶ 50. Both of these employees did so with knowledge of Judicial Watch's FOIA request, the relevant INR records systems and search tools, and internal policies. Id. ¶¶ 49–50; Stein Decl. ¶ 7. INR retrieved four responsive documents from these searches. Fischer Decl. ¶ 51.

In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request. Physicians for Human Rights v. U.S. Dep't of Def., 675 F.Supp.2d 149, 164 (D.D.C. 2009). Rather, agency officials have "discretion in crafting a list of search terms that 'they believe[] to be reasonably tailored to uncover documents responsive to the FOIA request.'" Agility Public Warehousing Co. K.S.C. v. NSA, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (alteration in original) (quoting Physicians for Human Rights, 675 F. Supp. 2d at 164). Based on the State Department's representations, the Court concludes that INR's decision to utilize variants of Aulaqi's full name was informed and reasonably calculated to find responsive materials. See id. at 339–40

17

("Although the NSA could have used additional variations of the plaintiff's name" to conduct its search for responsive records, "the NSA's search terms were reasonably calculated to lead to responsive documents."); Liberation Newspaper v. U.S. Dep't of State, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015) ("Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior.").

Nor does the fact that different offices used different search terms undermine the reasonableness of the State Department's search. Liberation Newspaper, 80 F. Supp. 3d at 146 ("Although the defendant used different search terms for different databases, this discrepancy does not undermine the conclusion that the search was reasonable given that the search terms were used after consultation with employees familiar with the databases."); Am. Fed'n of Gov't Emps., Local 812 v. Broad. Bd. of Governors, 711 F. Supp. 2d 139, 151 n.11 (D.D.C. 2010) ("Plaintiffs' argument that the search was inadequate because different officials used different terms when searching their own files is also unpersuasive."); Judicial Watch, Inc. v. U.S. Dep't of Hous. & Urban Dev., 20 F. Supp. 3d 247, 254 (D.D.C. 2014) ("Though some agencies may choose to search for responsive documents in a centralized fashion using consistent search terms and techniques across various departments, nothing in FOIA's text or the relevant case law requires an agency to do so.").

### 3.  Search Timeframe

Judicial Watch also objects to the temporal scope of the State Department's searches. Although the FOIA request itself did not identify a timeframe, Judicial Watch contends that the relevant timeframe is from June 2002 (when an arrest warrant for passport fraud issued for Aulaqi) to September 2011 (when Aulaqi was killed). See Pl.'s Opp'n and Cross-Mot. at 16. Based on this contention, Judicial Watch posits that there must be contemporaneous communications (in

particular, emails) concerning Aulaqi's passport fraud charges between high level officials in former Secretary Powell's office and within the Office of the Legal Advisor. Pl.'s Reply at 4–5. Judicial Watch also submits an almost entirely redacted April 2002 memorandum from the FBI Director to the Attorney General regarding Aulaqi and contends this document is evidence that "communications occurred among high level government officials and members of the U.S. Cabinet to the President" around the time of Aulaqi's passport fraud charges. Id. (citing Ex. 1, Cocta Decl. [ECF No. 57–1]). Judicial Watch therefore argues that the searches conducted by the Executive Secretariat and the Office of the Legal Advisor were inadequate because they were limited to the tenure of Secretary Clinton and did not include emails and other records from this earlier timeframe. See id. at 4.[14]

The State Department offers two responses. First, it states that its searches were not limited to Secretary Clinton's tenure; rather, IPS identified nine offices reasonably likely to contain responsive records, and it instructed those offices to execute their searches without date limits and unrestricted to any particular Secretary or administration. Defs.' Reply at 14; Stein Decl. ¶ 11. With respect to the Executive Secretariat, the Fischer declaration attests that a Management Analyst knowledgeable about the FOIA request identified STARS, CARS, and STePS as the electronic systems "reasonably likely to contain responsive records."[15] Fischer Decl. ¶ 69. The Management Analyst searched these systems without applying a date limitation and retrieved

---

[14] The Court limits its analysis to the adequacy of the search by the Executive Secretariat because it has already concluded that the State Department provided insufficient detail for the Court to evaluate the Legal Advisor's search.

[15] STARS is an automated system used to track, control, and record documents containing substantive foreign policy information passing to, from, and through the offices of the Secretary of State, the Deputy Secretary of State, the Under Secretaries of State, and the Counselor of the Department. Information in STARS covers the period 1988 through 2014. Fischer Decl. ¶ 69 n.6. CARS is designed to provide access to a contemporary portion of the Department's telegram archive. Id. ¶ 69 n.8. STePS is designed to distribute cables among the State Department's principals. Id. ¶ 69 n.7.

records through July 26, 2012, the date the search was conducted. Stein Decl. ¶ 4. Hence, the declarations clearly show that the Executive Secretariat search was not limited to Secretary Clinton's tenure. Moreover, as it did for Secretary Clinton, the State Department sent letters to former Secretaries Rice and Powell requesting the return of federal records in their possession; but none were returned. Id. ¶ 12. Even assuming that Judicial Watch is correct that there were high level communications between the State Department and the White House around 2002 (and the Court is not convinced of this fact by the redacted memorandum between the FBI Director and the Attorney General submitted by Judicial Watch), the State Department's searches were reasonably calculated to uncover such communications. See Fischer Decl. ¶¶ 44–45 (stating that IPS Program Analysts knowledgeable about the FOIA request conducted multiple full-text searches, without date limits, of the State Department's Central File, which contains, among other things "correspondence to and from the White House, members of Congress, and other federal agencies.").

The State Department next offers an explanation about why it was reasonable to search emails from Secretary Clinton, but not earlier Secretaries. It contends that "it is logical that State located only a relatively small number of documents from earlier administrations" because "it makes little sense that State . . . would possess records about a domestic criminal investigation being conducted . . . by the FBI." Defs.' Reply at 14–15. The State Department further contends that is why it makes sense that the FBI "released more than 4,000 pages from throughout the time period in question." Id. at 15. Moreover, "State . . . likely would not generate many records until [Aulaqi] left [the United States] and authorities considered revoking his passport," which did not occur until 2011. Id.

It is clear that the State Department's search of the Executive Secretariat was not limited to the tenure of a particular Secretary and covered the time period that Judicial Watch contends is relevant. Thus, Judicial Watch's argument really comes down to whether the Executive Secretariat's search was inadequate because it did not include a particular record system (i.e., emails from Secretary Powell's tenure). But under FOIA, "there is no requirement that an agency search every record system." Oglesby, 920 F.2d at 68. Even if the State Department failed to produce all communications concerning Aulaqi from 2002, that would not make the search unreasonable. Meeropol, 790 F.2d at 952–53. Here, the State Department tasked individuals knowledgeable about the FOIA request and the Executive Secretariat's systems with identifying the systems reasonably likely to contain responsive records and conducting searches for those records. Upon review of the declarations, the Court concludes that the Executive Secretariat's search was reasonably calculated to discover the requested documents. See SafeCard Servs., 926 F.2d at 1201 (the inquiry is "whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant"); see also Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micromanage the executive branch."). Judicial Watch's speculation that other responsive communications may exist does not undermine this conclusion. See Clemente, 2017 WL 3443034, at *4 (rejecting plaintiff's contention that search was inadequate "because it failed to uncover records she believes must exist"); DiBacco v. U.S. Army, 795 F.3d 178, 190 (D.C. Cir. 2015) (rejecting challenge to adequacy of search and explaining that, even though search "did not produce certain materials [plaintiff] believes exist and had hoped to find[,] . . . FOIA is not a wishing well; it only requires

a reasonable search for records"); Mobley v. CIA, 806 F.3d 568, 583 (D.C. Cir. 2015) ("In the absence of any supporting evidence, [plaintiff's] argument that files predating his arrest must have existed also fails to raise a material question of fact regarding the adequacy of the search.").

### 4. Newly Discovered Records

Judicial Watch also requests that the Court order the State Department to "search the newly discovered records being returned to the State Department by the FBI." Pl.'s Opp'n and Cross-Mot. at 20. But these records, as Judicial Watch acknowledges, are currently possessed by the FBI and outside of the State Department's custody and control. Id.; Stein Decl. ¶ 13. An agency has no obligation under FOIA to seek or produce records outside of its possession, custody, or control. See Judicial Watch, Inc. v. Fed. Hous. Fin. Agency, 646 F.3d 924, 926 (D.C. Cir. 2011) ("The Supreme Court has held that FOIA reaches only records the agency controls at the time of the request."); SafeCard Servs., 926 F.2d at 1201 ("If the agency is no longer in possession of the document, for a reason that is not itself suspect, then the agency is not improperly withholding that document and the court will not order the agency to take further action in order to produce it."); Veterans for a Strong Am. v. U.S. Dep't of State, 211 F. Supp. 3d 182, 192 (D.D.C. 2016) ("To the extent that the records they seek are outside State's possession and control, State is not required to search for them."). Other reasons favor denying this request. Neither the State Department nor Judicial Watch knows when the FBI will return these materials. Stein Decl. ¶ 13; Pl.'s Opp'n and Cross-Mot. at 20. Moreover, it seems entirely speculative that these materials will contain non-duplicative, responsive records, given that the State Department has already searched approximately 30,000 emails returned by former Secretary Clinton and only identified eight responsive records. See Fischer Decl. ¶¶ 74–76. For these reasons, the Court declines this request.

## CONCLUSION

The Court finds that the FBI properly withheld the surveillance videos under Exception 7(E). Hence, the Court grants the FBI's motion for summary judgment and denies Judicial Watch's motion for summary judgment on that issue. With respect to the State Department's search, the Court rejects Judicial Watch's arguments that the search was inadequate because the State Department: used variants of Aulaqi's last name rather than his full name, did not use uniform search terms across all offices, and limited the temporal scope of the search to the tenure of Secretary Clinton. The Court also rejects Judicial Watch's argument that the State Department is required to search records discovered by the FBI that are not in the possession of the State Department. The Court concludes, however, that the State Department has failed to provide certain details necessary for the Court to evaluate the adequacy of the searches for the following six offices: NEA, the U.S. Embassy in Sana'a, Yemen, OCS, PPT, Office of the Legal Adviser, and CT. The Court will provide the State Department with an opportunity to supplement the record with those details. Hence, the Court will deny the parties' motions for summary judgment on the question whether the State Department conducted an adequate search. A separate order accompanies this memorandum opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: September 6, 2017